# EXHIBIT 1

# E-FILED

Oct 5, 2007 8:00 AM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-095781 Filing #G-5367
By C. Fujihara, Deputy

M. VAN SMITH, State Bar No. 32007
DAMIAN R. FERNANDEZ, State Bar No. 206662
LAW OFFICE OF DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
Telephone: (408) 355-3021
Facsimile: (408) 904-7391
E-Mail: mvsmith@sbcglobal.net; damianfernandez@gmail.com

Attorneys for Plaintiff and the Proposed Class

# Superior Court of California
# County of Santa Clara

Department 17, Civil Complex Litigation: 161 North First Street, San Jose, 95113

TIMOTHY P. SMITH, on behalf of himself and all others similarly situated,

                    Plaintiffs,

vs.

APPLE INC.,

                    Defendant.

Case No.

**CLASS ACTION**

**COMPLAINT FOR TREBLE DAMAGES AND PERMANENT INJUNCTIVE RELIEF**

1.  Violation of the Cartwright Act
    (Cal. Bus. & Prof. Code, § 16720,
    Unlawful Trusts.)

2.  Violation of the Cartwright Act
    (Cal. Bus. & Prof. Code, § 16727,
    Unlawful Tying Agreement.)

3.  Violation of the Unfair Competition
    Law (Cal. Bus. & Prof. Code, § 17200.)

4.  Common Law Monopolization

**DEMAND FOR JURY TRIAL**

///

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-3021 • (408) 369-1002

# TABLE OF CONTENTS

**INTRODUCTION**                                                                    **5**
  1.   Factual Introduction.                                                          5
  2.   Legal Introduction.                                                            6

**JURISDICTION AND VENUE**                                                          **7**

**THE PARTIES**                                                                     **7**

**CLASS ACTION ALLEGATIONS**                                                        **8**
  1.   Class Size.                                                                    8
       A.   The basis for class size estimates.                                       9
       B.   Impracticability of joinder.                                             10
  2.   Common questions of law and fact.                                            10

**RELEVANT MARKET**                                                                **12**
  1.   The relevant product market for the iPhone and AT&T's
       cell phone service.                                                          12
  2.   The relevant market share of the iPhone.                                     12
  3.   The relevant market share for AT&T's cell phone service.                     12
  4.   The relevant geographic market for the iPhone and AT&T's
       cell phone service.                                                          13
  5.   A substantial amount of commerce was and will continue to be affected
       from the sale of AT&T's cell phone service together with the iPhone.         14

**CALIFORNIA ANTITRUST LAW**                                                       **15**
  1.   Summary and overview.                                                        15
  2.   Combination and collusion (Section 16720).                                   15
  3.   Exclusive dealing (Section 16727).                                           15
  4.   Tying agreements (Section 16727).                                            16

**THE DIGITAL MILLENNIUM COPYRIGHT ACT OF 1998**                                   **17**
  1.   Statutory background.                                                        17
  2.   Cell phone providers use software locks to restrain competition.             18
  3.   Unlocking cell phones is a lawful activity.                                  18

**FACTUAL ALLEGATIONS**                                                            **19**
  1.   Apple enters into an exclusive agreement with AT&T for the sale
       of the iPhone tied to the sale of AT&T's cell phone service.                 19
  2.   Apple unveils the iPhone.                                                    20
  3.   The uniqueness of the iPhone.                                                20
  4.   The desirability of the iPhone.                                             21
  5.   Apple's guerilla warfare tactics.                                            21
  6.   Verizon shuns Apple's demand for control.                                    21
  7.   Consumers lawfully unlock their iPhones to switch cell phone carriers.       22

**M. VAN SMITH**
**DAMIAN R. FERNANDEZ**
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-3021 • (408) 369-1062

8.    Apple declares that unlocked iPhones void consumers' warranties.    22
9.    Apple releases an update that "bricks" iPhones.    22
11.    A congressional subcommittee is critical of Apple's business model.    23

**FIRST CAUSE OF ACTION**    **24**
   **For Violation of Section 16720 of the Cartwright Act (Unlawful Trusts)**    **24**
1.    The elements of a *per se* tying agreement under section 16720.    25
2.    Apple's Agreement with AT&T is an unlawful trust because:
      (1) Apple prohibits iPhone consumers from using or purchasing
      a cell phone service other than through AT&T, and (2) the sale
      of the iPhone—the tying product—is exclusively linked to the sale
      of AT&T's cell phone service—the tied product.    25
3.    Apple has sufficient economic power in the iPhone (the tying market)
      to coerce the purchase of AT&T's cell phone service (the tied product).    25
4.    A substantial amount of commerce was and will continue to be affected
      from the sale of AT&T's cell phone service together with the iPhone.    26
5.    Apple's unlawful trust with AT&T substantially lessens
      competition and tends to create a monopoly in trade and commerce in
      California and throughout the entire United States.    26
6.    Plaintiff has sustained pecuniary loss as a result of Apple's
      unlawful trust.    28
7.    Plaintiff and the Class members paid supra-competitive prices for the
      iPhone and AT&T's cell phone service.    29

**SECOND CAUSE OF ACTION**    **31**
   **For Violation of Section 16727 of the Cartwright Act**
   **(Unlawful Tying Agreement)**    **31**
1.    The elements of a *per se* tying agreement under section 16727.    31
2.    Apple's Agreement with AT&T is an unlawful tying agreement
      because: (1) Apple prohibits iPhone consumers from using or
      purchasing a cell phone service other than through AT&T, and (2) the
      sale of the iPhone—the tying product—is exclusively linked to the sale
      of AT&T's cell phone service—the tied product.    31
3.    Apple has sufficient economic power in the iPhone (the tying
      market) to coerce the purchase of AT&T's cell phone service
      (the tied product).    32
4.    A substantial amount of commerce was and will continue to be
      affected from the sale of AT&T's cell phone service together with
      the iPhone.    32
5.    Apple's tying agreement with AT&T substantially lessens
      competition and tends to create a monopoly in trade and commerce in
      California and throughout the entire United States.    32
6.    Plaintiff has sustained pecuniary loss as a result of Apple's
      unlawful tying agreement.    33
7.    Plaintiff and the Class members paid supra–competitive prices for the
      iPhone and AT&T's cell phone service.    35

**M. VAN SMITH**
**DAMIAN R. FERNANDEZ**
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5021 • (408) 364-1002

**THIRD CAUSE OF ACTION**                                          **36**
    Unfair Competition in Violation of Section 17200        36

**FOURTH CAUSE OF ACTION**                                         **38**
    For Common Law Monopolization                           38

**PRAYER**                                                         **38**

**DEMAND FOR TRIAL BY JURY**                                       **40**

1

2

3

4

5

6

7   ///

8   ///

9   ///

10  ///

11  ///

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**M. VAN SMITH**
**DAMIAN R. FERNANDEZ**
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-3021 • (408) 361-1062

E-Filed: Oct 5, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5367

Plaintiff Timothy P. Smith, individually and on behalf of all others similarly situated ("Plaintiff"), for his complaint against defendant Apple Inc. ("Apple"), upon knowledge as to himself and his own acts, and upon information and belief as to all other matters, alleges as follows:

## INTRODUCTION

### 1.   Factual Introduction.

1.      Apple entered into an exclusive five year agreement with AT&T Mobility LLC ("AT&T") that establishes AT&T as the exclusive provider of cell phone service for the iPhone through 2012 ("Agreement"). As part of the Agreement, Apple receives a portion of AT&T's profit.[1] Apple's Agreement is a *per se* unlawful "tying" agreement because Apple prohibits iPhone consumers from using or purchasing a cell phone carrier[2] service other than AT&T. A tying agreement is a requirement that a buyer purchase one product or service as a condition of the purchase of another or that the sale of one product is linked to the other. Apple achieves its prohibition objectives by installing software locks on iPhones that prevent consumers from switching their cell phone service to a competitor's network. Apple's prohibition substantially lessens competition and tends to create a monopoly in the trade and commerce of the iPhone and AT&T's cell phone service.

2.      On September 27, 2007, Apple punished consumers for exercising their rights to unlock their iPhones. Apple issued a software update that "bricked"[3] or otherwise caused iPhone malfunctions for consumers who unlocked their phones and installed the update. Under an

///

---

[1] The.next.net, "Apple Takes Its Bite of iPhone Mobile Service Fees," July 2007, http://blogs.business2.com/business2blog/2007/07/apple-takes-its.html (accessed October 3, 2007).

[2] For ease of reference, "cell phone carrier" has the same meaning as cellular network provider, wireless telephone communication network provider, and mobile telecommunications network provider.

[3] When used in reference to electronics, "brick" describes a device which cannot function in any capacity (such as a machine with damaged firmware). This usage derives from the machine now being considered "as useful, and as entertaining, as a brick." Wikipedia, "Brick, (electronics) – Wikipedia, the free encyclopedia," http://en.wikipedia.org/wiki/Bricking (accessed October 1, 2007). Bricked iPhones are colloquially known as the "iBrick". (*Id.*, at http://en.wikipedia.org/wiki/Ibrick (accessed October 3, 2007).

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-3021 • (408) 369-1002

---

**COMPLAINT FOR TREBLE DAMAGES & INJUNCTIVE RELIEF**

exemption to the Digital Millennium Copyright Act of 1998, consumers can lawfully modify their phones for use on a cell phone network of their choice. Apple ignored the exemption in disregard of consumers' rights.

3.  When iPhone owners took their phones to Apple for repair, Apple refused to honor consumers' warranties. Instead, Apple gave a Marie-Antoinette-like response, "[let them] purchase a new iPhone," said Jennifer Bowcock, an Apple spokeswoman.[4]

## 2.  Legal Introduction.

4.  The Digital Millennium Copyright Act (17 U.S.C. § 1201) provides, in part, that "No person shall circumvent a technological measure that effectively controls access to a work protected under this title."

5.  In its 88-page recommendation to the Librarian of Congress, the Register of Copyrights determined that "a strict application of the statutory language of section 1201 would likely to result in a finding that one who circumvents the software lock on a cell phone in order to connect to a new network is engaging in unlawful circumvention of an access control."[5] The Register of Copyrights concluded that cell phone software locks are access controls that adversely affect the ability of consumers to make noninfringing use of the software on their cell phones.[6] Accordingly, on November 27, 2006, the Librarian of Congress—upon recommendation of the Register of Copyrights—issued an exemption for software programs that allow consumers to unlock their cell phones. The Register stated that the exemption was sought "for the sole purpose of permitting owners of cellular phone handsets to switch their handsets to a different network."[7] The exemption was codified in the Code of Federal Regulations as 37 CFR section 201.40(b)(5),

---

[4] Katie Hafner, "Altered iPhones Freeze Up," *The New York Times*, September 28, 2007, http://www.nytimes.com/2007/09/29/technology/29iphone.html?_r=1&em&ex=1191211200&en=37222d83199c5f92&ei=5087%0A&oref=slogin (accessed October 3, 2007).
[5] James H. Billington, the Librarian of Congress, *Recommendation of the Register of Copyrights*, November 17, 2006, U.S. Copyright Office, http://www.copyright.gov/1201/docs/1201_recommendation.pdf (accessed October 1, 2007).
[6] 71 Fed. Reg. 68472, 68476 (November 27, 2006), U.S. Copyright Office, http://www.copyright.gov/fedreg/2006/71fr68472.html (accessed October 1, 2007).
[7] *Id.*, at p. 68476.

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5002 • (408) 364-1062

E-Filed: Oct 5, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5367

1   effective November 27, 2007 and continuing through October 27, 2009.[8]

2       6.    The Register of Copyrights stated that the recommendation was not "intended to be

3   construed as expressing approval or disapproval of any particular business models, or as expressing

4   any views on telecommunications policy."[9]

5   

## JURISDICTION AND VENUE

6       7.    This Court has jurisdiction over this action pursuant to California Code of Civil

7   Procedure section 410.10. Plaintiff seeks damages on behalf of himself and all others similarly

8   situated under the laws of the State of California.

9       8.    Venue is proper in this Court pursuant to Code of Civil Procedure section 393 and

10   Civil Code section 1780(c), because:

11       (a)    the acts and transactions or any substantial portion thereof, as described

12   herein, occurred within Santa Clara County;

13       (b)    Santa Clara County is the place of Apple's  principal place of business;

14       (c)    the described injuries to property occurred within Santa Clara County.

15   

## THE PARTIES

16       9.    Plaintiff Timothy P. Smith is an individual residing in the State of California.

17   During the period of time covered by this Complaint, Plaintiff purchased an iPhone from Apple

18   together with the required AT&T cell phone service. He has been injured by reason of the

19   violations alleged herein.

20       10.    Defendant Apple Inc. ("Apple") is a California corporation whose headquarters and

21   principal place of business is in the City of Cupertino, County of Santa Clara, State of California.

22   As stated by Apple in a recent filing with the Securities and Exchange Commission:

23       Apple Inc. and its wholly-owned subsidiaries ("Apple" or the

24       "Company") designs, manufactures, and markets personal computers,
    portable digital music players, and mobile phones and sells a variety of

25       related software, services, peripherals, and networking solutions. The

26

27   [8] *Id.,* at p. 68472.

28   [9] James H. Billington, the Librarian of Congress, *Recommendation of the Register of Copyrights*, at p. 51, *supra* at *fn.* 5.

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5021 • (408) 369-1062

E-Filed: Oct 5, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5367

Company sells its products worldwide through its online stores, its retail stores, its direct sales force, and third-party wholesalers, resellers, and value-added resellers. In addition, the Company sells a variety of third-party Macintosh, iPod and iPhone compatible products including application software, printers, storage devices, speakers, headphones, and various other accessories and supplies through its online and retail stores. The Company sells to education, consumer, creative professional, business, and government customers.[10]

# CLASS ACTION ALLEGATIONS

11.     This suit is brought as a class action pursuant to section 382 of the California Code of Civil Procedure, on behalf of a class of:

all natural persons, sole proprietorships, partnerships, limited partnerships, corporations, and other entities who own an iPhone, intended for use by themselves, their families, or their members, participants, or employees (the "Class") during the period from June 29, 2007 through such time in the future as the effects of Apple's illegal conduct, as alleged herein, have ceased (the "Class Period").

## 1.     Class Size.

12.     Plaintiff does not, as yet, know the exact size of the class, but estimates it to be 1.28 million iPhone owners with a projected increase of 25 to 37.6 million within the next 18 months as described below in *The basis for class size estimates*.

13.     The number of unlocked iPhones is estimated at several hundred thousand people.[11] That number continues growing every day. (*Id.*)

///

///

///

///

///

---

[10] Apple Inc., Form 10-Q, "Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934," August 8, 2007, Q3/FY07, p. 5, http://library.corporate-ir.net/library/ 10/107/107357/items/257461/10Q_Q3FY07.pdf (accessed October 1, 2007).

[11] Erica Sadun, "iPhone Dev Team Issues Statement," September 25, 2007, *Tuaw.com*, http://www.tuaw.com/2007/09/25/iphone-dev-team-issues-statement (accessed October 2, 2007).

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5021 • (408) 369-1062

**A.      The basis for class size estimates.**

14.     On June 14, 2007, Apple's CEO Steve Jobs projected sales of 10 million iPhones within the first 18 months of the release date,[12] worth $3.99 to $4.19 billion in retail sales.[13] "We think 10 million is reasonable," Jobs said.[14] Some tech and Wall Street analysts believe Apple could exceed that.[15]

15.     On September 10, 2007, Apple announced that it sold its one millionth[16] iPhone, just 74 days after its June 29th release date.[17] Based on projections from this information, there are approximately 1.31 million iPhones that have been sold as of October 1, 2007.[18]

16.     Gene Munster, who covers Apple for investment firm Piper Jaffray, projects iPhone sales to be $15 billion by 2009 which amounts to projected sales of 25 to 37.6 million iPhones in

///

///

---

[12] Jefferson Graham and Edward C. Baig, "iPhone launch gives Apple's Steve Jobs butterflies," *The USA Today*, June 28, 2007, http://www.usatoday.com/tech/wireless/phones/2007-06-28-iphone-launch_N.htm (accessed October 1, 2007).

[13] From its debut through September 4, 2007, the 4 GB iPhone sold for $499 and the 8 GB iPhone sold for $599. (Apple, "Apple Premieres This Friday Night at Apple Retail Stores," June 28, 2007, http://www.apple.com/pr/ library/2007/06/28iphone.html (accessed October 1, 2007). On September 5, 2007, Apple dropped the price of its 8 GB iPhone to $399. (Apple, "Apple Sets iPhone Price at $399 for this Holiday Season," http://www.apple.com/pr/library/2007/09/05 iphone.html (accessed October 1, 2007). The range of $3.99 to $4.19 billion in retail sales is calculated as follows: the first 1 million phones at $399 to $599 equals $399 to $599 million. Nine million phones at $399 equals $3.59 billion.

[14] Jefferson Graham and Edward C. Baig, "iPhone launch gives Apple's Steve Jobs butterflies," *supra* at *fn.* 12.

[15] Jefferson Graham, "iPhone mania nears fever pitch," *The USA Today*, June 19, 2007, http://www.usatoday.com/tech/wireless/phones/2007-06-19-iphone-mania_N.htm (accessed October 3, 2007).

[16] Apple, "Apple Sells One Millionth iPhone," September 10, 2007, http://www.apple.com/pr/ library/2007/09/10 iphone.html (accessed October 1, 2007).

[17] Apple, "Apple Premieres This Friday Night at Apple Retail Stores," June 28, 2007. http://www.apple.com/pr/ library/2007/06/28iphone.html (accessed October 1, 2007).

[18] Calculation: As of September 10, 2007, 1 million iPhones were sold which is an average of 13,513 iPhones sold per day. *See fn. 16, supra.* Based on a daily sales average of 13,513 iPhones, there were approximately 310,799 iPhones sold from September 11, 2007 through October 3, 2007, inclusive.

**M. VAN SMITH**
**DAMIAN R. FERNANDEZ**
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5021 • (408) 369-1062

---

E-Filed: Oct 5, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5367

1    the next 15 months.[19]

2         **B.    Impracticability of joinder.**

3         17.    As discussed in "Relevant Market", the geographic market of the iPhone and

4    AT&T's cell phone service is worldwide. With a present class size of 1.31 million iPhone owners

5    and projections of 25 to 37.6 million in the next 15 months, joinder of all members of the Class

6    would not be practicable.

7    **2.    Common questions of law and fact.**

8         18.    There are questions of law and fact common to the class that predominate over any

9    questions that may affect only individual members of the Class, including, but not limited to:

10        (a)    Whether Apple's conduct violated section 16720 of the California Business

11   and Professions Code[20] relating to unlawful trusts;

12        (b)    Whether Apple's conduct violated section 16727 relating to unlawful

13   tying agreements;

14        (c)    Whether Apple's conduct violated section 17200 relating to unfair or

15   unlawful business acts or practices;

16        (d)    Whether Apple's conduct violated the common law;

17        (e)    Whether Apple's conduct was willful;

18        (f)    Whether Apple's acts, contracts, combinations and/or conspiracies restrained

19   trade, commerce, or competition for the purchase of the iPhone or the purchase of cellular wireless

20   services through carriers other than AT&T;

21        (g)    Whether Apple's conduct constitutes a *per se* violation of sections 16720

22   and 16727;

23        (h)    Whether Apple obtained, possessed and/or unlawfully used monopoly power

24

25        [19] Jefferson Graham, "iPhone mania nears fever pitch." The range of iPhone's sold is based on
26   the $399 low and the $599 high price of the iPhone at the time of Munster's projections. *See fn. 15,
     supra.*.
27        [20] Unless otherwise specified, all further statutory references are to the California Business and
28   Professions Code.

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-3024 • (408) 369-1062

---

over the Relevant Market for the iPhone and AT&T's cell phone service;

(i)      Whether, under common principles of California antitrust law, Plaintiff and the members of the Class suffered antitrust injury or were threatened with injury;

(j)      The amount of money to replace unlocked iPhones that were damaged by the iPhone Update;

(k)      The amount of overcharges, roaming charges, or amounts paid by members of the Class for AT&T's cell phone service over and above the amounts they would have paid in a competitive marked unaffected by Apple's illegal acts as alleged herein;

(l)      The amount of early termination fees paid by members of the Class from canceling their previous cell phone service while transferring to an iPhone;

(m)      The amount of third-party warranty plans paid by members of the Class as a result of Apple's statement that it will not honor warranties on unlocked iPhones;

(n)      The effect of Apple's conduct upon, and the injury caused to, the business or property of the Plaintiff and the members of the Class;

(o)      the type and measure of damages suffered by Plaintiff and the Class members.

19.      Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's claims are typical and representative of the claims of all members of the Class, all of whom own iPhones.

20.      There are no defenses of a unique nature that may be asserted against Plaintiff individually, as distinguished from the other members of the Class, and the relief sought is common to the Class. Plaintiff is a typical owner of the iPhone, does not have any interest that is in conflict with or is antagonistic to the interests of the members of the Class, and has no conflict with any other member of the Class. Plaintiff has retained competent counsel experienced in antitrust litigation and class action litigation to represent himself and the Class.

21.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy. In the absence of a class action, Apple will retain the benefits of its wrongful conduct.

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5021 • (408) 369-1062

**M. VAN SMITH**
**DAMIAN R. FERNANDEZ**
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-3021 • (408) 369-1062

# RELEVANT MARKET

**1.    The relevant product market for the iPhone and AT&T's cell phone service.**

22.    To the extent applicable to the claims alleged herein, the relevant product market for the iPhone and AT&T's cell phone service is:

> (1)    the worldwide market for the sale of cell phones, including the iPhone, and
>
> (2)    the market for the sale of cell phone services, including AT&T's cell phone service.

**2.    The relevant market share of the iPhone.**

23.    At all relevant times, including the present, Apple's market share in the iPhone and geographic markets was and is 100%.

**3.    The relevant market share for AT&T's cell phone service.**

24.    AT&T is the largest wireless carrier in the United States, serving more than 63.7 million customers.[21] According to Forrester Research, AT&T has a market share of 27.1%[22] as illustrated below:

///

///

///

///

///

///

///

---

[21] AT&T, "AT&T News Room," October 26, 2004, http://www.att.com/gen/press-room?pid=4800&cdvn=news&newsarticleid=21444 (accessed October 1, 2007); Michelle Roberts, "AT&T agrees to buy Dobson Communications," *The USA Today*, June 29, 2007, http://www.usatoday.com/money/economy/2007-06-29-1121518286_x.htm (accessed October 1, 2007).

[22] Leslie Cauley, "AT&T eager to wield its iWeapon," May 21, 2007, *The USA Today*, http://www.usatoday.com/tech/wireless/2007-05-21-at&t-iphone_N.htm (accessed October 1, 2007).

E-Filed: Oct 5, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5367

■ **WIRELESS MARKET SHARE**

Wireless provider AT&T is the leading
carrier in current wireless
communication market share.

| | |
|---|---|
| AT&T | 27.1% |
| Verizon | 26.3% |
| Sprint Nextel (2) | 23.6% |
| Others | 11.9% |
| T-Mobile | 11.1% |

Note: Market share values are calculated as if
they always have been combined

1 - AT&T acquired Cingular in 2004

2 - Sprint and Nextel merged

*Source: Forrester Research*

25.     On June 29, 2007—**the same day the iPhone went on sale**—AT&T purchased Dobson Communications Corp. for $2.8 billion in cash. The purchase added about 1.7 million customers to its nearly 62 million customer base at a time when some analysts were questioning how much larger carriers could grow in an already saturated U.S. wireless market.[23]

## 4.     The relevant geographic market for the iPhone and AT&T's cell phone service.

26.     The relevant geographic market for the iPhone and AT&T's cell phone service is worldwide with AT&T being the exclusive cell phone carrier for the iPhone in the United States.[24]

27.     On September 18, 2007, Apple announced that Telefónica's O2 Telecommunications would be the exclusive carrier of the iPhone in the United Kingdom. The iPhone is scheduled to go on sale on November 9, 2007 together with an 18-month contract.[25]

_____

[23] Michelle Roberts, "AT&T agrees to buy Dobson Communications," *fn. 21, supra.*
[24] Apple Inc. Form 10-Q. "Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934," *fn. 10, supra.*
[25] Apple, "Apple Chooses O2 as Exclusive Carrier for iPhone in UK," September 18, 2007. http://www.apple.com/pr/library/2007/09/18iphone.html (accessed October 1, 2007).

**M. VAN SMITH**
**DAMIAN R. FERNANDEZ**
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5021 • (408) 369-1062

28.     On September 19, 2007, Apple announced that Deutsche Telekom's T-Mobile would be the exclusive carrier of the iPhone in Germany. The iPhone is scheduled to go on sale on November 9, 2007 together with a 2-year contract.[26]

29.     On September 20, 2007, France Télécom announced that their wireless division Orange SA had a contract with Apple to offer iPhones in France.[27]

30.     Apple is expected to release the iPhone in Australia in 2008.[28]

31.     The market for the iPhone is worldwide because it can be used on any GSM network once the iPhone is unlocked.[29] It is reported that GSM is the most popular standard for mobile phones in the world, with its promoter, the GSM Association, estimating that GSM accounts for 82% of the global mobile market.[30]

**5.     A substantial amount of commerce was and will continue to be affected from the sale of AT&T's cell phone service together with the iPhone.**

32.     By distributing an equal amount of iPhone users to AT&T's individual and family cell phone plans, the monthly revenue generated by AT&T based on 1.31 million iPhones in use today is estimated as follows:

| Type of Cell Phone Plan | Monthly Cost | Estimated Revenue |
|---|---|---|
| Individual Plans | $39.99 to $199.99 | $52.39 to $261.99 million |
| Family Plans | $59.99 to $299.99 | $78.59 to $392.99 million |
| | **Total:** | $130.98 to $654.98 million |

---

[26] Apple, "Apple and T-Mobile Announce Exclusive Partnership for iPhone in Germany," September 19, 2007. http://www.apple.com/pr/library/2007/09/19iphone.html (accessed October 1, 2007).
[27] Laetitia Fontaine, "France Telecom's Orange To Distribute Apple iPhone In France," *The Wall Street Journal Online*, September 20, 2007. http://online.wsj.com/article/BT-CO-20070920-705999-Q4B7U_6vEH_eljKax_y25c35Ilw_20080930.html?mod=crnews (accessed October 1, 2007).
[28] Dan Warne, "Australia won't see iPhone 'til 2008,'" *Ninemsn*, January 10, 2007, http://apcmag.com/4959/australia_wont_see_iphone_til_2008 (accessed October 1, 2007).
[29] GSM is an acronym for Global System for Mobile communications.
[30] GSM Association, "GSM—the website of the GSM Association," http://www.gsmworld.com/gsmastats.shtml (accessed October 1, 2007).

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-3021 • (408) 369-1062

33.     Based on these estimates, AT&T's cell phone service substantially affects commerce to the tune of $130 to $654 million every month or $390 million to $1.96 billion to date.

# CALIFORNIA ANTITRUST LAW

## 1.     Summary and overview.

34.     California statutory antitrust law is found at sections 16600–17210 of the California Business & Professions Code. It consists of the Cartwright Act, the Unfair Practices Act, and the Unfair Competition Act, as well as various statutory restrictions on covenants not to compete. The Cartwright Act prohibits trusts, which are defined as a combination of capital, skill or acts by two or more persons to, among other things, create or carry out restrictions in trade or commerce. (Section 16720.) It also prohibits sales or leases of products on the condition that the purchaser not deal in the goods of a competitor where the effect is to substantially lessen competition or tend to create a monopoly in any line of commerce. (Section 16727.) The Unfair Practices Act prohibits sales below cost, locality discrimination, and secret rebates or unearned discounts which injure competition. (Section 17000 *et seq.*) The Unfair Competition Act generally prohibits any unlawful, unfair, or fraudulent business act or practice, as well as deceptive or misleading advertising. (Section 17200 *et seq.*)

## 2.     Combination and collusion (Section 16720).

35.     Section 16720 prohibits trusts, and is the Cartwright Act counterpart to Section 1 of the federal Sherman Act (15 U.S.C. § 2). Trusts are defined in section 16720 as any "combination" of capital, skill or acts by two or more persons to, among other things, carry out restrictions in commerce, prevent competition, or fix prices. Section 16720 applies to a wide variety of anticompetitive conduct, but applies only where there is proof of a "combination of resources of two or more independent entities for the purpose of restraining competition and preventing market competition." (*G.H.I.I. v. MTS, Inc.* (1983) 147 Cal. App. 3d 256, 266; *See also Chavez v. Whirlpool Corp.* (2001) 93 Cal. App. 4th. 363.)

## 3.     Exclusive dealing (Section 16727).

36.     Section 16727 provides, among other things, that it is unlawful to sell or lease goods, or give a rebate or price discount, on the condition that the purchaser not deal in goods of a

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5021 • (408) 369-1062

competitor where the effect is to substantially lessen competition or tend to create a monopoly. Section 16727 is a carbon copy of Section 3 of the Clayton Act (15 U.S.C. § 14). Like its federal counterpart, it does not prohibit all exclusive dealing contracts. Rather, California courts may apply the rule of reason and invalidate only those with the requisite anticompetitive effects. (*Gianelli Distributing Co. v. Beck & Co.* (1985) 172 Cal. App. 3d 1020.)

37.     The key issue under the rule of reason in exclusive dealing cases is whether the defendant has market power in the relevant market. (*Redwood Theatres v. Festival Enterprises* (1988) 200 Cal. App. 3d 687.) The relevant market normally includes all products that are reasonably interchangeable in price, use and quality. (*Exxon v. Superior Court* (1997) 51 Cal. App. 4th 1672, 1682-84.) If defendant has a small market share, or otherwise lacks market power, a court could find that the exclusivity requirement will not violate the Cartwright Act. (*Kim v. Servosnax* (1992) 10 Cal. App. 4th 1346.) However, market power may exist even though it falls short of market dominance and exists only with respect to some buyers due to the *desirability* of that product to those buyers, or the *uniqueness* of its attributes. (*Suburban Mobile Homes v. AMFAC Communities* (1980) 101 Cal.App.3d 532, 544.) (Emphasis added.)

## 4.     Tying agreements (Section 16727).

38.     One species of exclusive dealing is a tying agreement—a requirement that a buyer purchase one product or service as a condition of the purchase of another. Traditionally, the product that is the inducement for the arrangement is called the "tying product," and the product or service that the buyer is required to purchase is called the "tied product." A tying arrangement may be condemned under either or both sections 16720 and 16727. (*Morrison v. Viacom* (1998) 66 Cal. App. 4th 534, 540.)

39.     Tying may be *per se* illegal if the seller has market power over the first product or a substantial amount of commerce was affected in the sale of the second product. (*Suburban Mobile Homes v. AMFAC Communities* (1980) 101 Cal. App. 3d 532.) The *per se* rule is satisfied under section 16727 if either the market power or substantial commerce tests are satisfied. (*Morrison v. Viacom*, *supra*, at p. 542.) Under section 16720, both tests must be satisfied. (*Id.*)

///

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-3021 • (408) 369-1002

---

**COMPLAINT FOR TREBLE DAMAGES & INJUNCTIVE RELIEF**

E-Filed: Oct 5, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5367

# THE DIGITAL MILLENNIUM
# COPYRIGHT ACT OF 1998

## 1.   Statutory background.

40.     In 1998, Congress enacted the Digital Millennium Copyright Act (''DMCA''), which among other things, amended title 17, United States Code, to add section 1201 ("Section 1201"). Section 1201 prohibits circumvention of technological measures employed by or on behalf of copyright owners to protect their works ("access controls"). Specifically, section 1201(a)(1)(A) ("Copyright Prohibition") provides, in part, that "No person shall circumvent a technological measure that effectively controls access to a work protected under this title." In order to ensure that the public will have continued ability to engage in noninfringing uses of copyrighted works, such as fair use[31], subparagraph (B) of section 1201 limits this prohibition, exempting noninfringing uses of any ''particular class of works'' when users are (or in the next 3 years are likely to be) adversely affected by the prohibition in their ability to make noninfringing uses of that class of works. (Section 1201(a)(1)(B).) ("Copyright Exemption.")

41.     Identification of these exempt classes of works is made in a rulemaking proceeding conducted by the Register of Copyrights who provides notice of the rulemaking, seeks comments from the public, consults with the Assistant Secretary for Communications and Information of the Department of Commerce, and recommends final regulations to the Librarian of Congress. The Librarian of Congress, in exercising his authority under 17 U.S.C. section 1201(a)(1)(C) and (D), shall publish the classes of copyrighted works that shall be subject to the exemption from the Copyright Prohibition.

///
///
///
///

_____

[31] James H. Billington, the Librarian of Congress, *Recommendation of the Register of Copyrights*, p. 3., *fn. 9, supra.*

M. Van Smith
Damian R. Fernandez
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5021 • (408) 369-1002

E-Filed: Oct 5, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5367

## 2. Cell phone providers use software locks to restrain competition.

42.   Cell phone network providers are using various types of software locks in order to control customer access to the "bootloader" programs[32] on cellphones and the operating system programs embedded inside cell phones.[33] These software locks prevent customers from using their cell phones on a competitor's network (even after all contractual obligations to the original wireless carrier have been satisfied) by controlling access to the software that operates the cell phones (e.g., the mobile firmware).[34] The Register of Copyrights states that "the access controls do not appear to actually be deployed in order to protect the interests of the copyright owner or the value or integrity of the copyrighted work; rather, they are used by wireless carriers to limit the ability of subscribers to switch to other carriers, *a business decision that has nothing whatsoever to do with the interests protected by copyright.*"[35] (Emphasis added.)

## 3. Unlocking cell phones is a lawful activity.

43.   In its 88-page recommendation to the Librarian of Congress, the Register of Copyrights determined that "a strict application of the statutory language of § 1201 would be likely to result in a finding that one who circumvents the software lock on a cell phone in order to connect to a new network is engaging in unlawful circumvention of an access control."[36] The Register of Copyrights concluded that cell phone software locks are access controls that adversely affect the ability of consumers to make noninfringing use of the software on their cell phones.[37] Accordingly, on November 27, 2006, the Librarian of Congress—upon recommendation of the Register of Copyrights—issued an exemption for software programs that allow consumers to unlock their cell phones. The Register stated that the exemption was sought "for the sole purpose of permitting

---

[32] A bootloader is "A small program stored in ROM and responsible for initializing the hardware to a known initial state and making it possible to download application software to the system to be run." Jack Ganssle and Michael Barr, *Embedded Systems Dictionary* 33 (2003).

[33] 71 Fed. Reg. 68472, 68476, *fn. 6, supra.*

[34] *Id.*

[35] 71 Fed. Reg. 68472, 68476, *fn. 6, supra.*

[36] James H. Billington, the Librarian of Congress, *Recommendation of the Register of Copyrights, fn. 9, supra.*

[37] 71 Fed. Reg. 68472, 68476, *fn. 6, supra.*

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5021 • (408) 369-1062

owners of cellular phone handsets to switch their handsets to a different network."[38] The exemption was codified in the Code of Federal Regulations as 37 CFR section 201.40(b)(5), effective November 27, 2007 and continuing through October 27, 2009.[39]

# FACTUAL ALLEGATIONS

## 1. Apple enters into an exclusive agreement with AT&T for the sale of the iPhone tied to the sale of AT&T's cell phone service.

44.     On January 9, 2007, Apple announced that Cingular—now merged into AT&T—would be Apple's partner for the iPhone,[40] as follows:

(a)     AT&T to be the exclusive provider for iPhone cell phone service in the United States;

(b)     The duration of the exclusive agreement is to be five years until 2012;[41]

(c)     Apple is to receive a portion of AT&T's profit;[42]

(d)     iPhone consumers are to be prohibited from using a cell phone carrier[43] other than AT&T. The prohibition is achieved by the installation of software locks on the iPhone that prevents consumers from switching their cell phone service to a competitor's network;

(e)     Apple is to be restrained for a period of time from developing a version of the iPhone for CDMA[44] wireless networks. (*Id.*)

---

[38] *Id.*, at p. 68476.

[39] *Id.*, at p. 68472.

[40] Apple, "Apple Chooses Cingular as Exclusive U.S. Carrier for Its Revolutionary iPhone," January 9, 2007, http://www.apple.com/pr/library/2007/01/09cingular.html (accessed October 3, 2007).

[41] Leslie Cauley, "AT&T eager to wield its iWeapon," *fn. 22, supra.*

[42] The.next.net, "Apple Takes Its Bite of iPhone Mobile Service Fees," July 2007, http://blogs.business2.com/business2blog/2007/07/apple-takes-its.html (accessed October 3, 2007).

[43] For ease of reference, "cell phone carrier" has the same meaning as cellular network provider, wireless telephone communication network provider, and mobile telecommunications network provider.

[44] CDMA is an acronym for code division multiple access. CDMA allows many users to occupy the same time and frequency allocations in a given band or space. It is reported to consistently provide better capacity for voice and data communications than other commercial mobile technologies, allowing more subscribers to connect at any given time, and it is the common

*Continued  On Next Page*

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5021 • (408) 369-1002

---

E-Filed: Oct 5, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5367

45.     The restraint on Apple's development of the iPhone for CDMA networks is significant because AT&T's rivals use CDMA technology. Verizon has a 26.3% market share and is one of six U.S. carriers to use CDMA technology—the others being Sprint Nextel (23.6% market share), Alltel, U.S. Cellular, Cricket, Midwest Wireless, and Metro PCS.[45] AT&T uses GSM—a global standard incompatible with CDMA.

46.     If an iPhone user consumer terminates their cell phone agreement after the 30 day cancellation period, but before the expiration of their two-year service commitment, they will pay AT&T an early termination fee of $175 for *each* wireless telephone number associated with the service.[46]

47.     The *USA Today* describes Apple's agreement with AT&T as "an easy way to handcuff rivals and steal customers."[47]

## 2.     Apple unveils the iPhone.

48.     On June 29, 2007, Apple released the iPhone, a "revolutionary and magical product that is literally five years ahead of any other mobile phone," said Steve Jobs, Apple's CEO.[48]

## 3.     The uniqueness of the iPhone.

49.     "The largest and most beautiful screen I've ever seen on a cell phone," enthused *The Wall Street Journal*.[49] The iPhone is unique because unlike traditional phones, there is no keypad. It combines three of Apple's multimedia products. Not only is it a phone, but it combines a

---

platform on which Third-Generation (3G) wireless data services are built. (CDMA Development Group, "CDG: Technology: CDMA Technology." http://www.cdg.org/technology /index.asp (accessed October 1, 2007).

[45] Wikipedia, "Verizon Wireless – Wikipedia, the free encyclopedia," http://en.wikipedia.org /wiki/Verizon_wireless (accessed October 1, 2007).

[46] AT&T, "Service Agreement – AT&T." http://www.wireless.att.com/cell-phone-service/legal/service-agreement.jsp?q_termsKey=postpaidServiceAgreement&q_termsName= Service+Agreement (accessed October 1, 2007).

[47] Leslie Cauley, "AT&T eager to wield its iWeapon," *fn. 22, supra.*

[48] Apple, "Apple Reinvents the Phone with iPhone," January 9, 2007, http://www.apple.com/pr/library/2007/01/09iphone.html (accessed October 3, 2007).

[49] Walter S. Mossberg, "BlackJack Beats Out Palm 750, but iPhone May Well Top Both," *The Wall Street Journal Online*, January 11, 2007, http://online.wsj.com/article/SB116846792028 973034.html?mod=mostpop (accessed October 3, 2007).

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5021 • (408) 369-1002

---

widescreen iPod with touch-screen technology, and a breakthrough Internet communications device with desktop-class email, web browsing, maps, and searching—into one small handheld device.

### 4.    The desirability of the iPhone.[50]

50.    In San Francisco, consumer David Lau has heard it all, and he does not care. He wants his iPhone. "I have the gear lust that many people experience when the newest, coolest thing comes out," says Lau, 26, who works in real estate.[51] "I work in an office by myself, and this device gives me freedom. It could be my entire office anywhere I choose." (*Id.*) His girlfriend just wants him to stop talking about it. "For the past four weeks, I've heard nothing but iPhone talk from David, his friends, my brother and, basically, any male between the ages of 13 and 40 within earshot. It's insane. I'd pay 500 bucks and sleep outside in line to just shut these guys up." (*Id.*)

### 5.    Apple's guerilla warfare tactics.

51.    Stan Sigman, CEO of wireless at AT&T, makes no apologies for his tough approach. "I'm glad we have (the iPhone) in our bag," he says. "Others will try to match it, but for a period of time, they'll be playing catch-up."[52] "It's guerrilla warfare," says Jane Zweig, CEO of market researcher The Shosteck Group. "They all want to say 'We're No. 1.'"[53] The *USA Today* says that "carriers [are left] with one option, basically, for adding customers: steal them."[54] Charles Golvin, a wireless industry analyst at Forrester Research, says, "Today's market is not about finding new opportunities. It's about stealing somebody else's customers." (*Id.*) The software locks employed in the iPhone stifle competition by limiting consumers' choice to one cell phone carrier.

### 6.    Verizon shuns Apple's demand for control.

52.    Verizon passed on the opportunity to become Apple's exclusive U.S. distributor,

---

[50] *Cf. Suburban Mobile Homes v. AMFAC Communities* (1980) 101 Cal.App.3d 532, 544—market power may exist even though it falls short of market dominance and exists only with respect to some buyers due to the *desirability* of that product to those buyers, or the *uniqueness* of its attributes. (Emphasis added.)

[51] Jefferson Graham, "iPhone mania nears fever pitch," *fn. 15, supra.*

[52] *Id.*

[53] Leslie Cauley, "AT&T eager to wield its iWeapon," *fn. 22, supra.*

[54] *Id.*

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5021 • (408) 369-1062

**M. VAN SMITH**
**DAMIAN R. FERNANDEZ**
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5021 • (408) 369-1062

balking at Apple's demand for control over distribution, pricing, marketing and more.[55] Denny Strigl, Verizon's chief operating officer, decided to pass on the iPhone deal and says he has no regrets: "Time will tell" if he made the right call, he says. (*Id.*)

## 7.    Consumers lawfully unlock their iPhones to switch cell phone carriers.

53.    In August 2007, consumers downloaded various software programs available on the Internet that unlocked the iPhone. After it was unlocked, several hundred thousand consumers switched their cell phone service to the carrier of their choice. Under a year 2006 exemption to the federal Digital Millennium Copyright Act of 1998, discussed above, consumers had and still have the express and lawful right to unlock their cell phones to switch to other cell phone carriers.

## 8.    Apple declares that unlocked iPhones void consumers' warranties.

54.    On September 24, 2007, Apple issued a press release warning consumers that unlocked iPhones violated Apple's software license agreement and voided the warranty.[56]

## 9.    Apple releases an update that "bricks" iPhones.

55.    On September 27, 2007, Apple punished consumers for exercising their rights to unlock their iPhones.[57] Apple issued a software update to the iPhone—known as the iPhone Software Version 1.1.1 update. The update "bricked"[58] or otherwise caused iPhone malfunctions to consumers of unlocked iPhones. In response to consumers requests for help, a spokeswoman for Apple said, "[let them] purchase a new iPhone."[59]

---

[55] *Id.*
[56] PR News, "Apple today released the following statement," September 24, 2007, http://www.prnewswire.com/cgi-bin/stories.pl?ACCT=109&STORY=/www/story/09-24-2007/0004668880 (accessed October 3, 2007).
[57] *Cf.* Apple's 1984 television commercial that launched the Apple Macintosh computer. The commercial alluded to the growing market share of the IBM PC which grew from a 8.57% market share in 1982 to a 26.42% market share in 1983. The commercial played on the fears of IBM domination, and, by the mid-90s, the PC's market share was over 97%, although the International Business Machines Corporation (IBM) eventually exited from the PC market. (Wikipedia, "1984 (television commercial) – Wikipedia, the free encyclopedia," http://en.wikipedia.org/wiki/1984_(television_commercial) (accessed October 3, 2007).
[58] *See fn. 3, supra.*
[59] *See fn. 4, supra.*

---

October 4, 2007                  **COMPLAINT FOR TREBLE**                  Page 22 of 40
**DAMAGES & INJUNCTIVE RELIEF**

56.     Apple acted in defiance and without sufficient consideration of consumers' rights to unlock their iPhones because it knew that the probable result of its update would be to render unlocked iPhones inoperable. Although the update[60] itself warns that unlocking programs available on the Internet may cause irreparable damage to the iPhone's software, and that if a user has modified the iPhone's software, applying the software update "may result in your iPhone becoming permanently inoperable," it appears that Apple took no steps to issue an update with unlocked firmware or otherwise issue its update to prevent damage to unlocked iPhones.

57.     A picture of the warning to the iPhone Software Version 1.1.1 update ("iPhone Update") appears below.



**11.     A congressional subcommittee is critical of Apple's business model.**

58.     On July 11, 2007, the U.S. Congress' Subcommittee on Telecommunications and the Internet ("Subcommittee") held a hearing to examine the relationship between wireless consumers and wireless service providers.[61] The hearing, entitled "Wireless Innovation and Consumer

---

[60] The iPhone Update can be downloaded at http://movies.apple.com/movies /us/apple/iphone/ 2007/itunes_store/iphone-itunesstore_848x480.zip (accessed October 3, 2007).

[61] Congressman Ed Markey's official Web site, "July 11, 2007 – MARKEY: Wireless Innovation and Consumer Protection is Critical to Bright Wireless Future," U.S. Congress, House, Subcommittee on Telecommunications and the Internet, *Wireless Innovation and Consumer*

*Continued  On Next Page*

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5021 • (408) 369-1062

1    Protection" took place a week after the much-anticipated release of the Apple iPhone.[62]

2         59.    During his opening statement congressman and chairman of the Subcommittee, Ed

3    Markey said:

4              The iPhone highlights both the promise and the problems with the
5              wireless industry today. On the one hand, it demonstrates the sheer
               brilliance and wizardry of wireless engineering …. On the other hand,
6              the advent of the iPhone raises questions about the fact that a consumer
               can't use this phone with other wireless carriers, and that consumers in
7              some areas of the country where AT&T doesn't provide service can't
               use it in some neighborhoods at all … Moreover, even though
8              consumers must buy an iPhone for the full price for 500 or 600 dollars,
9              AT&T Wireless reportedly still charges an early termination fee of
               apparently $175 for ending the service contract early, even though the
10             phone cost wasn't subsidized and a consumer can't even take it to use
               with another network provider. This highlights problems with the
11             current marketplace structure, where devices are provided by carriers,
12             portability of devices to other carriers is limited or non-existent, and
               many consumers feel trapped having bought an expensive device or
13             having been locked into a long-term contract with significant penalties
               for switching.
14

15                         **FIRST CAUSE OF ACTION**

16                         **For Violation of Section 16720**

17                        **of the Cartwright Act (Unlawful Trusts)**

18        60.    Plaintiff, on behalf of himself and all others similarly situated, realleges and

19   incorporates herein by reference each of the allegations contained in the preceding paragraphs of

20   this Complaint, and further alleges against Apple as follows:

21   ///

22   ///

23   _____

24   *Protection*, 110th Cong., 1st sess., July 11, 2007, http://markey.house.gov/index.php?option=com_
25   content&task=view&id=2954&Itemid=141 (accessed October 1, 2007).
     [62] As of October 4, 2007, the hearing transcript was not available. The printed hearing should be
26   available within 90–120 days (October 9 to November 8, 2007) of the conclusion of the July 11th
     hearing. Committee on Energy and Commerce, "The House Committee on Energy and Commerce:
27   Hearing," http://energycommerce.house.gov/cmte_mtgs/110-ti-hrg.071107.Consumer
28   Protection.shtml (accessed October 4, 2007).

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-3021 • (408) 369-1002

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-3021 • (408) 369-1062

**1.      The elements of a *per se* tying agreement under section 16720.**

61.      Under section 16720, a *per se* tying arrangement is established if:

(1)      a tying agreement, arrangement, or condition existed whereby the sale of the tying product was linked to the sale of the tied product or service,

(2)      the party had sufficient economic power in the tying market to coerce the purchase of the tied product,

(3)      a substantial amount of commerce was affected in the sale of the tied product, and

(4)      the complaining party sustained pecuniary loss as a consequence of the unlawful act. (*Morrison v. Viacom* (1998) 66 C.A.4th 541; *Suburban Mobile Homes v. AMFAC Communities* (1980) 101 Cal. App. 3d 532.)

**2.      Apple's Agreement with AT&T is an unlawful trust because:
(1) Apple prohibits iPhone consumers from using or purchasing
a cell phone service other than through AT&T, and (2) the sale
of the iPhone—the tying product—is exclusively linked to the sale
of AT&T's cell phone service—the tied product.**

62.      The sale of the iPhone (the tying product) is linked to the purchase of a two year wireless service account with AT&T (the tied product).

63.      Purchasers cannot easily obtain the tied product (cell phone services) from another source because the iPhone is intentionally locked by Apple. Moreover, for those who manage to unlock their iPhones, Apple has demonstrated that its software updates render iPhones "permanently inoperable." Downloading the iPhone Update was important for consumers because the update addressed several security issues.[63]

**3.      Apple has sufficient economic power in the iPhone (the tying market)
to coerce the purchase of AT&T's cell phone service (the tied product).**

64.      Apple has sufficient economic power in the tying market (the iPhone) to coerce the

---

[63] Apple Inc., "About the Security Content of the iPhone 1.1.1 Update," September 25, 2007, http://docs.info.apple.com/article.html?artnum=306586 (accessed October 3, 2007).

E-Filed: Oct 5, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5367

purchase of the tied product (AT&T's cell phone service) because it has a 100% market share of the iPhone. Moreover, for some buyers, such as Plaintiff, the *desirability* of the iPhone and the *uniqueness* of its attributes has created a frenzy for himself and throughout the world. Even as of the third week of September 2007, New Yorkers have to wait 15 minutes in line to purchase an iPhone at 3:00 in the morning.[64]

**4.   A substantial amount of commerce was and will continue to be affected from the sale of AT&T's cell phone service together with the iPhone.**

65.     As discussed in Relevant Market, AT&T's revenue from the iPhone to date is estimated to be $130.98 to $654.98 million.

**5.   Apple's unlawful trust with AT&T substantially lessens competition and tends to create a monopoly in trade and commerce in California and throughout the entire United States.**

66.     Apple and AT&T entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described in this Complaint in violation of section 16720 of the California Business and Professions Code ("The Cartwright Act").

67.     The Cartwright Act states in section 16726 that: "Except as provided in this chapter, every trust is unlawful, against public policy and void." A trust is defined in section 16720 as follows:

A trust is a combination of capital, skill or acts by two or more persons for any of the following purposes:

(a)     To create or carry out restrictions in trade or commerce.

(b)     To limit or reduce the production, or increase the price of merchandise or of any commodity.

(c)     To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity.

---

[64] Liz Gannes, "Midnight Madness: Benjamins for iPhones in Manhattan," *GigaOM*, September 26, 2007, http://gigaom.com/2007/09/26/midnight-madness-benjamins-for-iphones-in-manhattan (accessed October 3, 2007).

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-3021 • (408) 369-1062

**M. VAN SMITH**
**DAMIAN R. FERNANDEZ**
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5021 • (408) 369-1062

(d) To fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this State.

(e) To make or enter into or execute or carry out any contracts, obligations, or agreements of any kind or description, by which they do all or any or any combination of the following:

    (1) Bind themselves not to sell, dispose of or transport any article or any commodity or any article of trade, use, merchandise, commerce or consumption below a common standard figure, or fixed value;

    (2) Agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure;

    (3) Establish or settle the price of any article, commodity or transportation between them or themselves and others, so as directly or indirectly to preclude a free and unrestricted competition among themselves, or any purchasers or consumers in the sale or transportation of any such article or commodity;

    (4) Agree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected.

68. Beginning with its exclusive agreement with AT&T in January 2007, Apple has engaged in continuing trusts in restraint of trade and commerce, attempts to monopolize, conspiracies to monopolize and monopolization of the Relevant Market, in requiring consumers to purchase AT&T's cell phone service with the purchase of the iPhone, in violation of the Cartwright Act.

69. Apple's trusts have included concerted action and undertakings with AT&T with the purpose and effect of:

(a) Allocating the California and the entire United States' market for iPhone cell phone service to AT&T;

---

(b)     Permitting AT&T to maintain a monopoly over California and the entire United States' market for iPhone cell phone service and charging supra-competitive prices for U.S. cell phone service and roaming charges while travelling abroad;

(c)     Precluding iPhone owners from unlocking their iPhones at the risk of voiding their warranties; and

(d)     Releasing the iPhone Update which damaged lawfully unlocked iPhones.

**6.      Plaintiff has sustained pecuniary loss as a result of Apple's unlawful trust.**

70.     As a direct and proximate result of Apple's combination and contract with AT&T to restrain trade and monopolize the Relevant Market, Plaintiff and members of the Class have suffered pecuniary loss and have been deprived of the benefits of free and fair competition on the merits as follows:

(a)     The amount of money to replace unlocked iPhones damaged by the iPhone Update;

(b)     The amount of overcharges, roaming charges, or amounts paid by members of the Class for AT&T's cell phone service over and above the amounts they would have paid in a competitive marked unaffected by Apple's illegal acts as alleged herein;

(c)     The amount of early termination fees paid by members of the Class from canceling their previous cell phone service while transferring to an iPhone;

(d)     The amount of third-party warranty plans paid by members of the Class as a result of Apple's statement that it will not honor warranties on unlocked iPhones;

(e)     The effect of Apple's conduct upon, and the injury caused to, the business or property of the Plaintiff and the members of the Class.

71.     Plaintiff, on behalf of himself and all others similarly situated, has been injured in his property as a result of Apple's violation of section 16720 for which he seeks treble damages, including pre-judgment interest, injunctive relief, and attorneys' fees and costs, pursuant to sections 16750(a) and 16761 of the California Business and Professions Code.

72.     The violation of section 16720 consists, without limitation, of a continuing combination, trust, agreement, understanding, and concert of action among Apple and AT&T,

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-3021 • (408) 369-1062

concerning the sale of the iPhone and AT&T's cell phone service in California and throughout the entire United States.

73.     For the purpose of forming and effectuating the aforesaid unlawful trust, Apple has done those things they agreed, combined, and conspired to do, as described in this Complaint.

74.     The unlawful trust had the following effects, among others:

(a)     The market for cell phone service for the iPhone has been allocated to AT&T, with a portion of AT&T monopoly profits being allocated to Apple in exchange for AT&T's exclusivity;

(b)     Plaintiff and class-members have been forced to pay supra-competitive prices for U.S. cell phone service and roaming charges while travelling abroad;

(c)     Other cell phone carriers have profited from early termination fees paid by pre-iPhone, pre-AT&T consumers;

(d)     Hundreds of thousands of iPhones are no longer operable or otherwise disabled because of the iPhone Update;

(e)     Consumers have refrained from purchasing iPhones because they do not want to switch their cell phone carrier to AT&T;[65]

(f)     Competition in the sale of iPhones with multiple cell phone carriers has been suppressed, restrained, and eliminated; and

(g)     Prices of the iPhones purchased by Plaintiff and other members of the Class have been raised, fixed, maintained, and stabilized at artificial and supra-competitive levels.[66]

## 7.     Plaintiff and the Class members paid supra-competitive prices for the iPhone and AT&T's cell phone service.

75.     During the period covered by this Complaint, Plaintiff and members of the Class

---

[65] David Cassel, "Steve Jobs Addresses New AT&T/Iphone Controversy," *Tech.Blorge.com*, June 28, 2007, http://tech.blorge.com/Structure:%20/2007/06/28/steve-jobs-addresses-new-attiphone-controversy (accessed October 3, 2007).

[66] *See generally*, AP Associated Press, "Woman Sues Over Apple's iPhone Price Cut," October 1, 2007, http://ap.google.com/article/ALeqM5ihibMdRH06j7AlMkqA78PS3QJH_gD8S0NCOG1 (accessed October 3, 2007).

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5021 • (408) 369-1002

purchased the iPhone directly from Apple. By reason of the alleged violations of antitrust laws, Plaintiff and the other members of the Class paid more for the iPhone and AT&T's cell phone service than they would have paid in the absence of the illegal trust and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

76.     Plaintiff and members of the Class are "persons" within the meaning of the Cartwright Act as defined in section 16702.

77.     The acts done by Apple as part of, and in furtherance of their contracts, combinations or conspiracies, were authorized, ordered or done by their respective officers, directors, agents, employers or representatives while actively engaged in the management of Apple's affairs.

78.     Apple's unlawful and anti-competitive contracts, combinations or conspiracies to prevent competition in California and the entire United States' marketplace for cell phone carriers other than AT&T, resulted in Plaintiff and the Class paying more than they would have paid for the iPhone and cell phone service.

79.     Apple's contracts, combinations and/or conspiracies are a *per se* violation of the Cartwright Act.

80.     As a result of Apple's unlawful and anti-competitive conduct, consumers continue to pay artificially inflated prices for the iPhone and AT&T's cell phone service. These prices are substantially greater than the prices that consumers would pay absent the illegal contracts, combinations or conspiracies alleged herein. As a result, Plaintiff and the Class have sustained and will continue to sustain substantial losses and damage to their property in the form of, among other things, overcharges and the payment of supra-competitive prices for U.S. cell phone service and roaming charges while travelling abroad.

81.     Apple's trust and conspiracy with AT&T to monopolize the Relevant Market for the iPhone, and actions to fix prices, violates the Cartwright Act. Accordingly, Plaintiff and members of the Class seek three times their damages caused by Apple's violations of the Cartwright Act and a permanent injunction enjoining Apple's continuing violations of the Cartwright Act.

///

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-3021 • (408) 369-1002

---

# SECOND CAUSE OF ACTION

### For Violation of Section 16727 of the

### Cartwright Act (Unlawful Tying Agreement)

82.     Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1–58 of this Complaint, and further alleges against Apple as follows:

**1.     The elements of a *per se* tying agreement under section 16727.**

83.     Under section 16727, a *per se* tying arrangement is found if the following elements (1) and (4) are established along with either element (2) or (3):

(1)     a tying agreement, arrangement, or condition existed whereby the sale of the tying product was linked to the sale of the tied product or service,

(2)     the party had sufficient economic power in the tying market to coerce the purchase of the tied product,

(3)     a substantial amount of commerce was affected in the sale of the tied product, and

(4)     the complaining party sustained pecuniary loss as a consequence of the unlawful act. (*Morrison v. Viacom* (1998) 66 C.A.4th 541; *Suburban Mobile Homes v. AMFAC Communities* (1980) 101 Cal. App. 3d 532.)

**2.     Apple's Agreement with AT&T is an unlawful tying agreement because: (1) Apple prohibits iPhone consumers from using or purchasing a cell phone service other than through AT&T, and (2) the sale of the iPhone— the tying product—is exclusively linked to the sale of AT&T's cell phone service—the tied product.**

84.     Apple's exclusivity Agreement with AT&T is an unlawful tying agreement because the sale of the iPhone—the tying product—is linked to the sale of AT&T's cell phone service—the tied product.

85.     Purchasers cannot easily obtain the tied product—cell phone service—from another source because the iPhone is intentionally locked by Apple to preclude consumers from switching cell phone carriers. Moreover, for those who manage to unlock their iPhones, Apple has

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070–6091
(408) 355-3021 • (408) 369-1062

---

1    demonstrated that its software updates render iPhones "permanently inoperable."

**3.    Apple has sufficient economic power in the iPhone (the tying market) to coerce the purchase of AT&T's cell phone service (the tied product).**

86.    Apple has sufficient economic power in the tying market (the iPhone market) to coerce the purchase of the tied product (AT&T's cell phone service) because Apple as a 100% market share of the iPhone. Moreover, for some buyers, such as Plaintiff, the *desirability* of the iPhone and the *uniqueness* of its attributes has created a frenzy throughout the world.[67]

**4.    A substantial amount of commerce was and will continue to be affected from the sale of AT&T's cell phone service together with the iPhone.**

87.    As discussed in "Relevant Market", AT&T's revenue from the iPhone to date is estimated to be $130.98 to $654.98 million.

**5.    Apple's tying agreement with AT&T substantially lessens competition and tends to create a monopoly in trade and commerce in California and throughout the entire United States.**

88.    Apple and AT&T entered into and engaged in a continuing unlawful tying agreement in restraint of the trade and commerce described in this Complaint in violation of section 16727 of the California Business and Professions Code ("The Cartwright Act").

89.    The Cartwright Act states in section 16727 that:

> It shall be unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the

---

[67] Liz Gannes, "Midnight Madness: Benjamins for iPhones in Manhattan," *fn.* 62, *supra.*
Jefferson Graham, "iPhone mania nears fever pitch," *fn. 15, supra.*

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5021 • (408) 369-1002

1   effect of such lease, sale, or contract for sale or such condition,
2   agreement or understanding may be to substantially lessen
    competition or tend to create a monopoly in any line of trade or
3   commerce in any section of the State.

4   90.   Beginning with its exclusive agreement with AT&T in January 2007, Apple has

5   engaged in a continuing tying agreement in restraint of trade and commerce, attempts to

6   monopolize, conspiracies to monopolize and monopolization of the Relevant Market, in linking the

7   purchase of the iPhone exclusively with AT&T's cell phone service, in violation of the

8   Cartwright Act.

9   91.   Apple's tying agreement has included concerted action and undertakings with

10   AT&T with the purpose and effect of:

11   (a)   Allocating the entire U.S. market for iPhone cell phone service to AT&T;

12   (b)   Permitting AT&T to maintain a monopoly over the entire U.S. market for

13   iPhone cell phone service and charging supra-competitive prices for U.S. cell phone service and

14   roaming charges while travelling abroad;

15   (c)   Precluding iPhone owners from unlocking their iPhones at the risk of voiding

16   their warranties; and

17   (d)   Releasing the iPhone Update which damaged lawfully unlocked iPhones.

## 6.   Plaintiff has sustained pecuniary loss as a result of Apple's
##       unlawful tying agreement.

20   92.   As a direct and proximate result of Apple's combination and contract to restrain

21   trade and monopolize the Relevant Market, members of the Class have suffered pecuniary loss and

22   have been deprived of the benefits of free and fair competition on the merits as follows:

23   (a)   The amount of money to replace unlocked iPhones damaged by the

24   iPhone Update;

25   (b)   The amount of overcharges, roaming charges, or amounts paid by members

26   of the Class for AT&T's cell phone service over and above the amounts they would have paid in a

27   competitive marked unaffected by Apple's illegal acts as alleged herein;

28   (c)   The amount of early termination fees paid by members of the Class from

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-3042 • (408) 369-1002

canceling their previous cell phone service while transferring to an iPhone;

(d)     The amount of third-party warranty plans paid by members of the Class as a result of Apple's statement that it will not honor warranties on unlocked iPhones;

(e)     The effect of Apple's conduct upon, and the injury caused to, the business or property of the Plaintiff and the members of the Class.

93.     Plaintiff, on behalf of himself and all others similarly situated, has been injured in his property as a result of Apple's violation of section 16727 for which he seeks treble damages, including pre-judgment interest, injunctive relief, and attorneys' fees and costs, pursuant to sections 16750(a) and 16761 of the California Business and Professions Code.

94.     The violation of section 16727 consists, without limitation, of a continuing combination, trust, agreement, understanding, and concert of action among Apple and AT&T, concerning the sale of the iPhone and AT&T's cell phone service in California and throughout the entire United States.

95.     For the purpose of forming and effectuating the aforesaid unlawful tying agreement, Apple has done those things they agreed, combined, and conspired to do, as described in this Complaint.

96.     The unlawful tying agreement had the following effects, among others:

(a)     The market for cell phone service for the iPhone has been allocated to AT&T, with a portion of AT&T monopoly profits being allocated to Apple in exchange for AT&T's exclusivity;

(b)     Plaintiff and Class members have been forced to pay supra-competitive prices for U.S. cell phone service and roaming charges while travelling abroad;

(c)     Other cell phone carriers have profited from early termination fees paid by pre-iPhone, pre-AT&T consumers;

(d)     Hundreds of thousands of iPhones are no longer operable or otherwise disabled because of the release of the iPhone Update;

///

///

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5021 • (408) 369-1062

(e)      Consumers have refrained from purchasing iPhones because they do not want to switch their cell phone carrier to AT&T;[68]

(f)      Competition in the sale of iPhones with multiple cell phone carriers has been suppressed, restrained, and eliminated; and

(g)      Prices of the iPhones purchased by Plaintiff and other members of the Class have been raised, fixed, maintained, and stabilized at artificial and supra-competitive levels.[69]

## 7.      Plaintiff and the Class members paid supra–competitive prices for the iPhone and AT&T's cell phone service.

97.      During the period covered by this Complaint, Plaintiff and members of the Class purchased the iPhone directly from Apple. By reason of the alleged violations of antitrust laws, Plaintiff and the other members of the Class paid more for the iPhone and the AT&T cell phone service than they would have paid in the absence of the illegal trust and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

98.      Plaintiff and members of the Class are "persons" within the meaning of the Cartwright Act as defined in section 16702.

99.      The acts done by Apple as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered or done by their respective officers, directors, agents, employers or representatives while actively engaged in the management of Apple's affairs.

100.      Apple's unlawful and anti-competitive contracts, combinations or conspiracies to prevent competition in the California and the entire United States' marketplace for cell phone carriers other than AT&T, resulted in Plaintiff and the Class paying more than they would have paid for the iPhone and cell phone service.

101.      Apple's contracts, combinations and/or conspiracies are a *per se* violation of the

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-3021 • (408) 369-1092

---

[68] David Cassel, "Steve Jobs Addresses New AT&T/Iphone Controversy," *supra,* at *fn.* 63.
[69] *See generally*, AP Associated Press, "Woman Sues Over Apple's iPhone Price Cut," *supra* at *fn.* 64.

Cartwright Act.

102.    As a result of Apple's unlawful and anti-competitive conduct, consumers continue to pay artificially inflated prices for the iPhone and AT&T's cell phone service. These prices are substantially greater than the prices that consumers would pay absent the illegal contracts, combinations or conspiracies alleged herein. As a result, Plaintiff and the Class have sustained and will continue to sustain substantial losses and damage to their property in the form of, among other things, overcharges and the payment of supra-competitive prices for U.S. cell phone service and roaming charges while travelling abroad.

103.    Apple's trust and conspiracy with AT&T to monopolize the Relevant Market for the iPhone, and actions to fix prices violates the Cartwright Act. Accordingly, Plaintiff and members of the Class seek three times their damages caused by Apple's violations of the Cartwright Act and a permanent injunction enjoining Apple's continuing violations of the Cartwright Act.

# THIRD CAUSE OF ACTION

## Unfair Competition in Violation of Section 17200

104.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges against Apple as follows:

105.    Apple's actions to restrain trade, monopolize the market for the iPhone, and fix prices constitutes unfair competition and unlawful, unfair, and fraudulent business acts and practices in violation of California Business and Professional Code sections 17200, *et seq.*

106.    Apple's conduct in engaging in combinations of capital, skill, and acts with AT&T with the intent, purpose, and effect of acquiring and perpetuating Apple and AT&T's monopoly, creating and carrying out restrictions in trade and commerce, increasing or maintaining the price of the iPhone and AT&T's cell phone service, and restraining trade and preventing competition in the Relevant Market, constitutes and was intended to constitute unfair competition and unlawful, unfair, and fraudulent business acts and practices within the meaning section 17200.

107.    Apple also violated California's Unfair Competition Act by violating the Cartwright Act.

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-5021 • (408) 369-1002

---

**COMPLAINT FOR TREBLE**
**DAMAGES & INJUNCTIVE RELIEF**

108.   As a result of Apple's violations of Code section 17200, Apple has unjustly enriched itself at the expense of Plaintiff and the Class members. The unjust enrichment continues to accrue as the unlawful, unfair, and fraudulent business acts and practices continue.

109.   To prevent their unjust enrichment, Apple should be required pursuant to Business and Professions Code sections 17203 and 17204 to disgorge their illegal gains for the purpose of making full restitution to all injured Class members identified hereinabove. Apple should also be permanently enjoined from continuing their violations of section 17200.

110.   The acts and business practices, as alleged herein, constituted and constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of section 17200, *et seq.*, including, but in no way limited to, the following:

(a)   violations of sections 16720 and 16727 as set forth above; and

(b)   common law monopolization.

111.   Apple's acts and business practices as described above, whether or not in violation of sections 16720 and 16727, the Cartwright Act, or common law monopolization, are otherwise unfair, unconscionable, unlawful, and fraudulent.

112.   The illegal conduct alleged herein is continuing, and there is no indication that Apple will refrain from such activity into the future.

113.   Accordingly, Plaintiff, on behalf of himself and all others similarly situated, requests the following classwide equitable relief:

(a)   that a judicial determination and declaration be made of the rights of Plaintiff and the Class members, and the corresponding responsibilities of Apple;

(b)   that Apple be declared to be financially responsible for the costs and expenses of a Court-approved notice–program by mail, Internet, broadcast media, and publication designed to give immediate notification to Class members; and

(c)   requiring disgorgement and/or imposing a constructive trust upon Apple's ill-gotten gains, freezing Apple's assets, and/or requiring Apple to pay restitution to Plaintiff and to all members of the Class of all funds acquired by means of any act or practice declared by this Court to

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070–6091
(408) 355-5021 • (408) 369-1062

be an unlawful, unfair, or fraudulent, business practice, or to constitute unfair competition.

## FOURTH CAUSE OF ACTION

### For Common Law Monopolization

114.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges against Apple as follows:

115.    Apple has engaged in predatory and anticompetitive conduct intentionally to obtain and maintain monopoly power  for Apple and AT&T in the Relevant Market in violation of common law.

116.    Apple has willfully acquired and maintained monopoly power, and Apple now has 100% of the California and the entire United States' markets for the iPhone.

117.    Apple willfully acquired monopoly power and maintained it by suppressing the competition in the iPhone and cell phone service for the iPhone through restrictive and exclusionary conduct. Apple entered into an exclusive agreement with AT&T with the specific intent of acquiring and maintaining monopoly power.

118.    Plaintiff and the Class members, suffered injury in their property as a result of Apple's monopoly power and anticompetitive conduct because Plaintiff and members of the Class have been, and continue to be, forced to purchase the iPhone and AT&T's cell phone service at inflated prices, rather than a less expensive alternative through other carriers.

119.    Apple forced Plaintiff and the Class members to pay substantially more for the iPhone and cell phone service than they would have paid in a competitive marketplace either for the iPhone or for AT&T's cell phone service.

120.    Plaintiff and the Class members are entitled to bring this action and to recover herein compensatory damages, the cost of bringing suit, and reasonable attorneys' fees.

## PRAYER

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays that this Court enter judgment on behalf of himself and the Class members, adjudging and decreeing that:

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-3021 • (408) 369-1062

---

1.   This action may be maintained as a class action under section 382 of the California Code of Civil Procedure and/or section 1781 of the California Civil Code, and certifying Plaintiff as representative of the Class and designating his counsel as counsel for the Class;

2.   Apple has engaged in a trust, contract, combination, or conspiracy in violation of California Business and Professions Code section 16750(a), and that Plaintiff and the members of the Class have been damaged and injured in their property as a result of this violation;

3.   The alleged combination and conspiracy be adjudged and decreed to be an unreasonable restraint of trade in violation of the Cartwright Act, including sections 16720 and 16727;

4.   Plaintiff and the members of the Class recover threefold the damages determined to have been sustained by them as a result of Apple's conduct complained of herein as provided in California Business and Professions Code section 16750(a), and that judgment be entered against Apple for the amount so determined;

5.   Apple's conduct constitutes unlawful, unfair, and/or fraudulent business practices within the meaning of California's Unfair Competition Act, and California Business and Professions Code sections 17200, *et seq.*;

6.   Judgment be entered against Apple and in favor of Plaintiff and each member of the Class, for restitution and disgorgement of ill-gotten gains as allowed by law and equity as determined to have been sustained by them, together with the costs of suit, including reasonable attorneys' fees'

7.   Judgment be entered against Apple and in favor of Plaintiff and each member of the class, for damages arising from Apple's monopolization of the Relevant Market as determined to have been sustained by them, together with the costs of suit, including reasonable attorneys' fees;

8.   For prejudgment and post-judgment interest;

9.   For a permanent injunction precluding Apple from:

    a.   selling the iPhone with any software lock;

    b.   denying warranty service to users of unlocked iPhones;

    c.   requiring iPhone consumers to purchase their cell phone service through AT&T.

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-3021 • (408) 369-1002

---

1    10.    For equitable relief, including a judicial determination of the rights and

2    responsibilities of the parties;

3    11.    For attorneys' fees;

4    12.    For costs of suit, and

5    13.    For such other and further relief as the Court may deem just and proper.

6                        **DEMAND FOR TRIAL BY JURY**

7        Plaintiff, on behalf of himself and all others similarly situated, hereby demands a trial by

8    jury for all issues so triable.

9    Date: October 4, 2007                    LAW OFFICE OF M. VAN SMITH

10

11                                            By: _____/S/_____

12                                               M. Van Smith
                                                 Attorney for Plaintiff and the Proposed Class
13

14   Date: October 4, 2007                    LAW OFFICE OF DAMIAN R. FERNANDEZ

15

16                                            By: _____/S/_____

17                                               DAMIAN R. FERNANDEZ
                                                 Attorney for Plaintiff and the Proposed Class
18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

M. VAN SMITH
DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
(408) 355-3024 • (408) 369-1002

**THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**ELECTRONIC FILING - WWW.SCEFILING.ORG**
**c/o Glotrans**
2915 McClure Street
Oakland, CA94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

# E-FILED

Oct 5, 2007 8:00 AM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-095781 Filing #G-5367
By C. Fujihara, Deputy

### THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

### IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| TIMOTHY P. SMITH, on behalf of himself and all others similarly situated, Plaintiffs, | Smith v. Apple, Inc. |
| Plaintiff, | Lead Case No.1-07-CV-095781 |
| vs. | Judge Jack Komar |
| APPLE, INC., Defendants. | |
| Defendant. | **PROOF OF SERVICE** |
| AND RELATED ACTIONS | **Electronic Proof of Service** |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Thu. October 4, 2007 at 5:03 PM PDT and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Thu. October 4, 2007 at 5:03 PM PDT

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on October 4, 2007 at Oakland, California.

Dated: October 4, 2007                    For WWW.SCEFILING.ORG

Andy Jamieson

**THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG**

**Electronic Proof of Service**
**Page 2**

**Document(s) submitted by Damian Fernandez of Law Office of Damian R. Fernandez on Thu. October 4, 2007 at 5:03 PM PDT**

1. Summons Filed: Summons